Marc S. Strecker, Esq. – Bar No. 140644
STRECKER LAW OFFICES
2600 Michelson Drive, Suite 1700
Irvine, CA 92612
Telephone: (949) 852-3600
Facsimile: (949) 861-9696
Email: marc.strecker@sbcglobal.net

Philip Kaufler– Bar No. 81160
Law Offices of Philip Kaufler,
A Professional Corporation
8383 Wilshire Blvd., Suite 830
Beverly Hills, California 90211
Telephone: (323) 655-0961
Facsimile:  (323) 655-9655
E-mail: philip@kauflerlaw.com

Attorneys for Plaintiff JANICE FOX

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JANICE FOX**, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>**THEODORE FOX, an Individual and as Trustee of the GERSON FOX AND GERTRUDE FOX FAMILY TRUST and as Trustee of the BEARBIZ IRREVOCABLE TRUST, ULTIMATE ACTION, LLC, a Nevada limited liability company, SUPREME STUDIOS, a Nevada limited liability company, TF PROPERTIES #2, a California limited liability company, TF PROPERTIES** | **CASE NO:**  2:21-cv-06422 FLA (MAAx)<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) ELDER ABUSE BY ISOLATION**<br><br>**(2) ELDER ABUSE - FINANCIAL**<br><br>**(3) BREACH OF FIDUCIARY DUTY**<br><br>**(4) IMPOSITION OF CONSTRUCTIVE TRUST**<br><br>**(5) UNJUST ENRICHMENT** |

1
FIRST AMENDED COMPLAINT

**#3, a California limited liability company, BARRY FOX, an individual, and DOES 1 through 50 and ROE Entities 51 through 100,**

Defendants.

**(6) INVALIDITY OF TRUST AMENDMENT – WILL CONTEST**

**(7) INTENTIONAL INTERFERENCE WITH INHERITANCE RIGHTS**

**(8) DEMAND FOR AN ACCOUNTING**

**(9) PETITION TO DECLARE SPECIAL TRUSTEE AGREEMENT INVALID**

**(10) PETITION TO DECLARE THE IRREVOCABLE BEARBIZ TRUST INVALID**

**(11) DEMAND FOR AN ACCOUNTING RE GERTRUDE FOX**

**(12) DEMAND FOR AN ACCOUNTING RE BEARBIZ, ULTIMATE ACTION, SUPREME STUDIOS, TF PROPERTIES 2 AND TF PROPERTIES 3**

**(13) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**DEMAND FOR JURY TRIAL**

<u>THE PARTIES</u>

A.   **Individual Parties**

1.   Gertrude Fox ("Gertrude") was born on October 20, 1928 and was 92 years of age when she died on December 25, 2020. Gertrude is the mother of

2
FIRST AMENDED COMPLAINT

Plaintiff Janice Fox ("Janice"), Defendant Theodore Fox ("Theodore") and Defendant Barry Fox ("Barry").  It was the death of Gertrude just a few months ago that prompted an investigation into what was just discovered as the massive financial abuse perpetrated by Theodore and assisted by Barry.  At all times mentioned herein, Gertrude was a resident of the State of California, County of Los Angeles.

2.      Gerson Fox ("Gerson") is the father of Janice, Theodore and Barry. At all relevant times herein Gerson has lived in Los Angeles County.  On information and belief, Gerson is currently residing at a nursing facility in Los Angeles, California.

3.      Janice as daughter of Gertrude is an intestate heir of Gertrude, and on information and belief she was also a beneficiary of one-third of the Fox Family Trust through approximately 2012 when Theodore and Barry used undue influence and financial and physical coercion to cause their parents to change their estate plan and remove Janice's one-third share.  Janice will succeed as the sole beneficiary to the estate of Gertrude per *Probate Code § 259* if she establishes with clear and convincing evidence that Theodore and Barry have committed physical abuse (through isolation) and/or financial abuse of Gertrude.

4.      Theodore is the younger brother of Janice and one of the sons of Gertrude and Gerson.  At all times relevant herein, Theodore has lived both in Los

**FIRST AMENDED COMPLAINT**

Angeles County where he has a home, and in Las Vegas, Nevada where he has a second home.

5.     At all times relevant herein, Barry has lived in Israel and Janice is informed and believes that Barry visits Los Angeles from time to time and is still a citizen of the United States.

**B.     Entity and Doe Defendants**

6.     Janice is informed and believes that Defendant Ultimate Action, LLC ("Ultimate Action") is a Nevada limited liability company, with Theodore as its manager and its only member and 100% owner.

7.     Janice is informed and believes, and on that basis alleges, that at all times relevant to this Complaint, Ultimate Action is and has been (a) the alter ego, co-conspirator, duly authorized agent, servant, employee and/or representative of Theodore; and (b) acting within course, scope and authority of such conspiracy, agency, service, employment and/or representation.  Additionally, Janice is informed and believes, and on that basis alleges, that Ultimate Action: (a) was legally responsible for the occurrences alleged herein; and (b) proximately caused Janice's damages.

8.     Janice is informed and believes and based thereon alleges that Theodore is the special trustee of the Gerson and Gertrude Fox Family Trust (the "Fox Family Trust"). Janice is informed and believes that the Fox Family Trust was created on or about July 17, 2006 and amended several times thereafter.

**FIRST AMENDED COMPLAINT**

9.      Janice is informed and believes and thereon alleges that the Bearbiz Irrevocable Trust ("Bearbiz") is an irrevocable trust formed under the laws of California and settled by Gerson and his late wife Gertrude on or about April 4, 2011.

10.      Janice is informed and believes and thereon alleges that Theodore is the Trustee of Bearbiz and that Theodore together with Barry are the beneficiaries of Bearbiz.  By virtue of being a trustee of both the Fox Family Trust and Bearbiz, with virtually unlimited powers Theodore was a fiduciary of both trusts.

11.      Janice is informed and believes that Defendant Supreme Studios, LLC ("Supreme Studios") is a Nevada limited liability company created on May 12, 2010 with Theodore as its manager and primary member.

12.      Janice is informed and believes, and on that basis alleges, that at all times relevant to this Complaint, Theodore was acting: (a) as the alter-ego, co-conspirator, duly authorized agent, servant, employee and/or representative of Supreme Studios; and (b) within the course, scope and authority of such conspiracy, agency, service, employment and/or representation.  Additionally, Janice is informed and believes, and on that basis alleges, that Supreme Studios: (a) was legally responsible for the occurrences alleged herein; and (b) approximately caused Janice's damages.

13.      Upon information and belief, at all times relevant hereto, there existed a united of interest between Supreme Studios such that any individuality and

**FIRST AMENDED COMPLAINT**

separateness between them has ceased to exist and Theodore was a mere alter ego of Supreme Studios.

14.    Janice is informed and believes that Defendant TF Properties #2 ("TF Properties 2") is a California limited liability company registered with the Secretary of State on June 7, 2012, with Theodore as its manager and its primary member.

15.    Janice is informed and believes that Defendant TF Properties #3 LLC ("TF Properties 3") is a California limited liability company registered with the Secretary of State on March 23, 2015 with Theodore as its manager and its primary member.

16.    Janice is informed and believes, and on that basis alleges, that at all times relevant to this Complaint, Theodore was acting: (a) as the alter-ego, co-conspirator, duly authorized agent, servant, employee and/or representative of TF Properties 2 and TF Properties 3; and (b) within the course, scope and authority of such conspiracy, agency, service, employment and/or representation.  Additionally, Janice is informed and believes, and on that basis alleges, that TF Properties 2 and TF Properties 3: (a) were legally responsible for the occurrences alleged herein; and (b) proximately caused Janice's damages.

17.    The true names, capacities, and/or liabilities of Does 1 through 50 (individuals) and Roes 1 through 100 (entities) inclusive, whether individual, corporate, associate or otherwise, are presently unknown to Janice, who therefore

**FIRST AMENDED COMPLAINT**

sues said persons and entities by such fictitious names. Janice will seek leave to amend this Complaint to show the true names and capacities of these Doe and Roe defendants, when they have been ascertained, or according to proof at trial. Indeed, Janice anticipates that those defendants will be added when their identities are discovered through discovery and the parties' investigations progress. Janice is informed and believes that Theodore and Barry have established a complex corporate and limited liability structure consisting of several affiliated entities in an attempt to obscure, hide, and conceal their business activities and assets. Janice is informed and believes, and on that basis alleges that each of the Defendants (including those sued as Does 1 through 50 and Roes 51 through 100) are legally responsible for the acts and omissions herein complained of, as alleged below. Additionally, because of the intertwined and tangled business affairs of the presently named Defendants and the Doe and Roe Defendants, the Doe and Roe Defendants are within the "Defendants" as that term is used in this Complaint.

18.    Janice is informed and believes, and on that basis alleges, that at all times relevant to this Complaint, each of the Defendants was acting: (a) as the alter-ego, co-conspirator, duly authorized agent, servant, employee and/or representative of the other defendants; and (b) within the course, scope and authority of such conspiracy, agency, service, employment and/or representation. Additionally, Janice is informed and believes, and on that basis alleges, that each of Does 1 through 50, inclusive and Roes 1 through 100: (a) were legally

7
**FIRST AMENDED COMPLAINT**

responsible for the occurrences alleged herein; and (b) proximately caused Janice's damages.

19.    Upon information and belief, at all times relevant hereto, there existed a unity of interest between each of the Defendants (including those sued as Does 1 through 50 and Roes 51 through 100) such that any individuality and separateness between them have ceased to exist and each Defendant was a mere alter ego of each other Defendant.

## NATURE OF ACTION

20.    Through a combination of malicious slander, elder abuse isolation, massive financial elder abuse, irreconcilable conflicts of interests, breach of fiduciary duties, sheer intimidation and bullying and greed, the defendants, who are a combination of individuals and wholly owned alter ego entities took advantage of their elderly and ill parents to take and secrete from them nearly their entire multi-million dollar estate leaving them totally dependent upon these defendants for their basic needs.

21.    On information and belief, it is alleged that these defendants had at least two goals in mind.  First, they did not want to wait until their parents died to inherit their share of their estate so they devised a plan to take all of their assets while they were still alive.  Those assets consisted of valuable commercial and residential properties worth many millions of dollars and cash in the bank as well as other assets.

22.     Second, they wanted to make certain that through their use of slander, isolation, intimidation and bullying and by retaining lawyers ostensibly for their parents but who worked at the direction of the defendants that they were able to convince and/or coerce their elderly and vulnerable parents to remove plaintiff as a one-third beneficiary of the estate, leaving for themselves and additional several million dollars of estate assets.

23.     These acts of isolation and financial abuse have been continuous and ongoing from 2012 to the present.  The isolation continues to this day as does the financial abuse.  The defendants still retain all of the property and cash they took from their vulnerable and elderly parents.

24.     Through one core set of deliberate actions the defendants committed elder abuse, breach of fiduciary duties, used undue influence to eliminate plaintiff as a beneficiary of their parents' estate plan, and intentionally interfered with inheritance expectancy.

25.     This action also involves numerous and deliberate conflicts of interest between one of the defendants, who through undue influence, duress and coercion obtained the status of special trustee, with an unconscionable fee arrangement which currently provides fees of nearly $2 Million per year, without requirement of any specific work activity.  This special trustee arrangement was devised by Theodore to siphon off the estate for himself so as to deny plaintiff and other beneficiaries the bulk, if not the entire estate.

9
**FIRST AMENDED COMPLAINT**

26.    As part of the scheme to exercise undue influence on his elderly and ill parents, Theodore selected new lawyers for them, directed these lawyers, and used those lawyers to assist him in slandering plaintiff in a despicable manner, out of extreme jealousy and greed.

27.    To make matters worse, while Theodore was in a fiduciary relationship, he engaged in a massive conflict of interest whereby he had a straw man, another attorney, purchase secured creditors' claims against the estate and then transfer those claims to him so he could foreclose on those claims wiping out the trustees' and beneficiaries' interest in the trust.  In other words, Theodore purchased creditors' claims against his own parents, and on information and belief, used his parents' own money to buy those claims and then foreclose on those claims taking over millions of dollars worth of property in the process and either holding said claims to this day or in some cases selling them off and keeping the proceeds for himself, while his parents relied upon him for their most basic needs, including depriving them of much needed healthcare.

28.    These actions of elder abuse by way of isolation and financial elder abuse is supported by clear and convincing evidence.

29.    These acts of elder abuse trigger a statutory remedy whereby it is deemed that the two defendant abusers, Theodore and Barry, predeceased the decedent Gertrude and are disinherited. *Probate Code §259.*

**FIRST AMENDED COMPLAINT**

**30.**    *Welf. & Inst. Code* § 15610.30(b) provides that a person or entity "shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity… knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." The case law has interpreted this to be a conclusive presumption of elder abuse.

## <u>GENERAL ALLEGATIONS COMMON</u>
## <u>TO ALL CAUSES OF ACTION</u>

31.    Janice is informed and believes and based thereon alleges that on or about August 1, 2011 Gerson and Gertrude created a Special Trustee Agreement.

32.    This Special Trustee Agreement was created through undue influence and coercion by Theodore for the compensation of Theodore at levels that are far beyond anything that would ever be considered reasonable so as to deliberately strip the Fox estate from Janice and partly from Barry, and to accelerate and advance the entire corpus of the estate directly to Theodore prior to the death of the settlors.

33.    When the Special Trustee Agreement was created, Gerson and Gertrude were already in their 80s and deemed to be elders by statute.  They were both suffering from physical and mental ailments at the time.

34.     In addition to their elderly status and illness, both Gerson and Gertrude were under extreme financial stress when Theodore was appointed special trustee.

35.     Theodore capitalized on their vulnerable state and financial issues and used undue influence to secure for himself a lucrative and startling agreement. Theodore saw the situation of his parents, took advantage of their desperate circumstances and devised a compensation package that would eliminate any interest his parents had in their estate and in the process also wipe out the assets of the estate from the beneficiaries of the estate.

36.     The Special Trustee Agreement recites that the effective date of the agreement is as of August 1, 2011 and shall continue in force for a period of 10 years. Thereafter, it recites that the agreement shall be renewed automatically for successive terms of three years unless either party gives written notice to the other party at least 90 days prior to the expiration of any term of such party's intention not to renew.

37.     The compensation structure to Theodore from the Special Trustee Agreement began at $75,000 per month as of August 11, 2011 and provides that Theodore's compensation will increase every year by an additional $10,000 per month.  Based on the formula the monthly compensation is currently $165,000 per month or $1,980,000 per year.  The compensation continues to either get paid or

accrues for the entire 10 years plus renewals regardless of whether there is any work activity required by the trust.

38.     The Special Trustee Agreement further provides that "payments shall be made only to the extent that there is reasonably available cash from the Fox Properties' operations as a whole… If cash is not available, such unpaid salary will accrue (without interest) until the Trust is able to make such payments to Special Trustee.  Both the Trustees and that Special Trustee are mindful of the possibility that all or part of the compensation of the Special Trustee may not be paid, in whole or part, to the Special Trustee due to the problems with the Fox Properties. The Special Trustee has agreed to accept that risk but the Trustees wanted to be clear the compensation to be paid to the Special Trustee is to be paid before any distributions are made to their heirs." The agreement further provides that the Special Trustee shall be paid as additional compensation $500,000 for past services provided.

39.     The compensation to Theodore was a device created and structured by Theodore such that the accumulated compensation over the last 10 years would be used to diminish or in fact eliminate all assets of the Gerson and Gertrude estate so as to effectively wipe out any interest that Janice may have inherited as an heir to the Fox estate.

40.     The cumulative total either paid or accumulated for the benefit of Theodore over the last 10 years now stands at approximately $11,780,000.00.  This

13

**FIRST AMENDED COMPLAINT**

compensation package was the product of undue influence and coercion and is just one part of the massive financial abuse perpetrated by Theodore against his elderly and ill parents as part of his elder abuse.

41.     Janice is informed and believes that on November 28, 2011, and eighth amendment to the Fox Family Trust was executed – whereby Theodore was given the unilateral power to withdraw or borrow money from the Fox Family Trust for any trust purpose.  This amendment was entered into while Theodore was in a fiduciary relationship with the trustees and beneficiaries.  It is presumed to be invalid as the product of undue influence.

42.     As a fiduciary of the Fox Family Trust and Bearbiz, Theodore was required to act with the utmost honesty and integrity and make full disclosure to the beneficiaries of these trusts of all material facts concerning the existence of these trusts, transactions of the trusts, and of course to not engage in fraudulent or criminal activity with regard to these trusts.

43.     Theodore breached his fiduciary duties by actively concealing, to this day, the existence of these trusts or the self-serving and fraudulent transactions he engaged with concerning these trusts.

44.     Theodore further breached his fiduciary duties as to both the Fox Family Trust and Bearbiz by failing to ever render an accounting to their beneficiaries.

45.     Theodore also breached his fiduciary duties by failing to disclose his conflict of interest in being a trustee of the two trusts while at the same time he was the largest creditor of both trusts of their settlors Gerson and Gertrude.

46.     Janice further alleges that Theodore is the alter ego of Bearbiz in that Theodore is the sole trustee, and a beneficiary with full rights and unfettered discretion to effectively treat the assets and income of Bearbiz as if it were wholly owned by Theodore, including the right to sell assets, incur liabilities, pay himself compensation and borrow against assets.

47.     Janice is further informed and believes and thereon alleges that Bearbiz was conceived of and created by Theodore as a device to siphon off the estate of Gertrude and Gerson to Theodore and a small portion, if any remaining, to Barry. Janice is informed and believes that Gerson received no consideration from Bearbiz in exchange for his transfer of the Membership Interests to Bearbiz.

48.     In relevant part, Section 5.01(a)(1) of Bearbiz provides Theodore with the authority to "distribute as much of the trust property to or for the benefit of any beneficiary as our Trustee determines… [and] may distribute net income, principal, or both."

49.     Section 5.01(a)(2) of Bearbiz provides Theodore with the authority to "make distributions to or for the benefit of one or more trust beneficiaries to the complete exclusion of the other beneficiaries in equal or unequal amounts…"

15
**FIRST AMENDED COMPLAINT**

50.     Janice is informed and believes that on April 4, 2011, Gerson executed fourteen (14) separate assignments of membership interests from himself individually and as a trustee of the Fox Family Trust, to Bearbiz.  Each assignment of membership interest is executed by Gerson and Theodore.  On information and belief there was no consideration paid by either Theodore or Barry.

51.     Janice is informed and believes that Ultimate Action was used by Theodore to buy substantial creditor judgments, charging liens and other liens recorded and/or claimed against his father Gerson and mother Gertrude in a four step process.  These acts were in breach of his fiduciary duties to both the Fox Family Trust and Bearbiz and to all the beneficiaries of both trusts.

52.     First, Theodore used an intermediary to purchase the judgments, charging orders and liens.  Second, Theodore purchased those judgments, charging orders and liens from the intermediary totaling in value in excess of $20 Million, for a fraction of their face value.  Third, Theodore, through his wholly owned company, Ultimate Action asserted these same claims, liens, charging orders and assignments of judgments against his parents Gerson and Gertrude at full value.  Fourth, Theodore obtained writs of executions, orders for appearance of judgment debtor against Gerson and Gertrude and an application for sale of dwelling against Gertrude and/or against her trust.  All the while Theodore was in a fiduciary relationship with Gerson and Gertrude as he was a trustee and special trustee of the

Fox Family Trust and the Bearbiz Irrevocable Trust as well as being the major beneficiary of these two trusts.

53.    The transactions by which Ultimate Action purchased the creditor claims, first through an intermediary and then a purchase by Ultimate Action from the intermediary was concealed by Theodore.

54.    Prior to the death of Gertrude and while both Gertrude and Gerson were alive but when they were over 80 years old, Theodore, through undue influence, coercion, isolation, financial abuse and breach of fiduciary duty took for himself virtually the entire estate of Gertrude and of Gerson Fox so that they were completely dependent on Theodore for their financial support.  On information and belief the estate taken by Theodore was worth many millions of dollars.

55.    To further conceal the multitude of transactions by which Theodore took from Gertrude and Gerson virtually their entire assets and income Theodore used straw men and a multitude of limited liability companies that he owned, controlled and managed.  None of the assets was taken by Theodore in his own name as part of his scheme so that the transactions and his involvement would remain hidden from Janice and the other beneficiaries of the various trusts.

56.    At all relevant times Barry worked together with Theodore to commit acts of elder abuse by way of isolation and financial abuse as describe throughout this Complaint, and he further assisted Theodore in the acts of intentional interference of Janice's inheritance rights.

57.    On information and belief, it is alleged that Janice was previously bequeathed an inheritance of one-third of the estate of decedent Gertrude through testamentary documents duly executed by Gertrude.  Through the designed campaign against Janice of many and continuous years of elder abuse by way of carefully orchestrated and malicious isolation of Gertrude and of Gerson Fox, financial abuse of Gertrude and of Gerson, coercion, duress and slandered perpetrated by Theodore, by himself an through his wholly owned companies Ultimate Action, Supreme Studios, TF Properties 2 and TF Properties 3 and through his use of Bearbiz and the Fox Family Trust, Theodore used undue influence to cause Gertrude and Gerson to revise their estate plan to remove the one-third bequest in favor of Janice. To this day, it is still unknown by Janice when and if she was completely removed as an heir to the Gerson and Gertrude estate plan or an heir to their various trusts.  On information and belief, at the time of her death, Gertrude personally owned real estate located at 337 S. Roxbury Dr., Beverly Hills, California 90212 and through Shops at Shenandoah Shopping Center, LLC, a limited liability company, owned real estate located at 15300 E Smoky Hill Rd, Aurora, Colorado 80015, in addition to other real and personal property and assets.

58.    Janice, through counsel has made inquiries attempting to obtain the estate plan from Theodore, through his lawyers, but the requests have been denied.

**FIRST AMENDED COMPLAINT**

59.    In addition to the foregoing, through the use of a deliberate and complex scheme of financial and physical elder abuse, utilizing a myriad of companies and using his position of trustee and special trustee, Theodore stripped the multi-million dollar estate of Gertrude and Gerson taking their assets and money for himself, leaving his parents with minimal assets and income and substantially unable to meet their basic needs, including proper health care without having to resort to full reliance on Theodore for their subsistence.

60.    Theodore deliberately put his parents into desperate circumstances so that he could control them so that they would be forced to distance themselves from Janice and their grandchildren, that they loved and spent so much time with for so many years.

61.    With complete control of the assets and income, previously owned and enjoyed by Gerson and Gertrude their living conditions became desperate. They were deliberately isolated by Theodore from Janice, her children Kele Kirshchenbaum ("Kele"), Alexander Masket ("Alexander") and Adam Kaufler ("Adam"), Gertrude's brother, Rabbi Samuel Fox and their friends. At the same time they were denied basic healthcare and other necessities.  In their twilight years as elders in their 80s and 90s they were completely controlled by and dependent on Theodore.

62.     The relationships between Gertrude and Gerson and Janice were close for their entire lives, until Theodore deliberately and maliciously devised and executed his plan of intimidation, isolation and control.

63.     Prior to Theodore's intimidation and bullying, Gertrude and Gerson did many things together with Janice; they spoke daily, did charity work together; they spent time at each others' homes; had many dinners and lunches at Janice's home; Janice preparing food for Gertrude and Gerson to take home virtually every week; spent many Sabbaths together at Janice's home; spent many Jewish holidays together, with Gertrude and sometimes Gerson sleeping over many nights during the year; traveled together; went to restaurants together; went to movies together; went to professional sporting events together; Gertrude and sometimes Gerson went to Kele, Alex and Adam's elementary, middle school and high school team sports games and cheering them on; going to synagogues together; Gertrude coming to Janice's house, nearly every Wednesday to learn Jewish law and Bible together with Janice's friends; went to lunch together with Janice's friends; celebrated life cycle events together, including a weekend bar mitzvah of Adam; birthdays together; Chanukah together; Rosh Hashanah together, Sukkoth together; charity banquets together; Passover weeks, usually outside of the United States and many other times together.  When Janice started having children Gertrude and Gerson spent a lot of time together with Janice and their grandchildren doing many

of the things described above together with Janice, her husband and their grandchildren.

64.     Theodore's actions were deliberately planned, in part to force his parents to give up on a relationship with Janice and their own grandchildren and they were also planned to enrich Theodore and his ill-gotten acquisition of the bulk of the Fox family multi-million dollar estate and conceal same from Janice and the grandchildren.

65.     This conduct as described hereinabove related to elder isolation and financial abuse has been continuous for the past several years.  The financial elder abuse and isolation elder abuse has continued to the present and is ongoing.

66.     Janice did not discover the financial abuse and this complex scheme until after the death of her mother Gertrude on December 25, 2020.  Much of Theodore and Barry's overall and specific plan is still unknown to Janice.

67.     Janice is still unaware of what has become of the assets and income taken by Theodore and Barry, even though they are both fiduciaries with obligations of full disclosure.  There has been no disclosure to Janice by either of them of any of the conduct as alleged in this Complaint and there has been no disclosure of the other activity that remains actively concealed by Theodore and Barry.

/ / /

/ / /

**FIRST AMENDED COMPLAINT**

# FIRST CAUSE OF ACTION

## (ELDER ABUSE BY ISOLATION)

## [Janice Against Theodore and Barry]

## (*Welfare and Institutions Code* § 15610.43)

68.     Janice incorporates by reference paragraphs 1 through 67 and realleges same as if fully set forth herein.

69.     Janice has standing to bring this claim for both physical and financial elder abuse pursuant to Section 15657.3(d) of the *Welfare and Institutions Code* which provides, in pertinent part, that an intestate heir whose interest is affected by the elder abuse action may commence or maintain the action, as may an "interested person" under *Probate Code* § 48. That section defines "interested person" as an heir, devisee, child, spouse, creditor, beneficiary or any other person having a property right in or claim against the estate that may be affected by the proceeding. Alternatively, standing is based upon the authority set out in *Estate of Lowrie* (2004) 118 Cal.App. 4th 712, 717 to the effect if the abuser is the only one with standing then anyone who has an interest in the estate has standing to bring the action in place of the abuser.

70.     Beginning in or about October 2012 and continuing to the present, Theodore, with the complicity and assistance of Barry, began a campaign to isolate Gerson and Gertrude from Janice and coerced and intimidated Gerson and

Gertrude to cut off ties with Janice and their three grandchildren, Kele, Alexander and Adam.

71.     The isolation was only one part of Theodore's scheme to wrest control of the Fox estate from his sister, Janice. He also engaged in a campaign of malicious slander against Janice.

72.     On information and belief the coercion and intimidation consisted of economic threats and physical threats.  Theodore and Barry used various deliberate tactics to isolate Gerson and Gertrude from the rest of their family.  It was a fully planned scheme to isolate Gerson and Gertrude from Janice and their own grandchildren, for the purpose of monetary gain.

73.     Theodore wanted and he believed he needed Janice and her adult children to be kept away from Gerson and Gertrude so that he could perpetrate his massive and intricate financial abuse without anyone discovering his scheme against his own parents, solely for his own benefit.

74.     At the time this plan to isolate Gerson and Gertrude from their daughter and grandchildren were initiated, Gerson and Gertrude were in their 80s. On information and belief it is alleged that Gerson had been in and out of hospitals and rehabilitation nursing facilities for several years with heart issues and a series of transient ischemic attacks ("TIAs") also known as mini-strokes.  That together with diabetes and other illnesses has kept Gerson bedridden for most of the past 8 to 10 years.

**FIRST AMENDED COMPLAINT**

75.    On information and belief, it is alleged that Gertrude had also been in poor physical and mental health for the past many years, including suffering early stage dementia within the years leading up to her death.

76.    On information and belief, by the time they were in their 80s Gerson and Gertrude had worked hard for the previous 60 years accumulating commercial and other properties and cash valued in the many millions of dollars.

77.    By the time they were in their 80s both Gerson and Gertrude slowed down, had serious illness and were vulnerable to undue influence.  At the same time, while they were in their eighties, Gerson and Gertrude were experiencing severe financial stress.  Their real estate and cash fortune was compromised by a series of lawsuits and claims, some of which was caused by Theodore.

78.    Seeing an opportunity for himself and with assistance from Barry, Theodore embarked on a scheme to take advantage of the age, poor health and financial stress of his parents and developed a comprehensive plan to divest Gerson and Gertrude from their assets and into the hands of mostly, if not entirely to Theodore and some to Barry.

79.    Theodore sought out new attorneys for his parents so that he could control his parents' new lawyer to assist Theodore in his complex plan to take complete control of all of his parents' assets for himself and to Barry.

80.    On information and belief, Theodore did secure counsel for his parents, but this new counsel, Gary Gitlin was actually in complicity with

24
**FIRST AMENDED COMPLAINT**

Theodore and acting on his behalf to achieve his main prize, which was to remove Janice and her children from their parents' estate plan.  On information and belief it is alleged that Gerson never met or even spoke to Gitlin, but he purportedly represented Gerson and Gertrude at the direction of Theodore.

81.    The first step, devised by Theodore was to create complete isolation between Gerson and Gertrude from their daughter Janice and their adult grandchildren Kele, Alexander and Adam.  At the time this plan was first conceived, Janice and her children had a very good relationship with Gerson and Gertrude.

82.    Theodore then instructed, and on information and belief used the letterhead of Gitlin to write a series of nasty and slanderous letters about Janice. The reason the letters appear to have been written by Theodore or dictated by him or heavily revised by him is that the contents of the letters are so slanderous and vile that it is unlikely that these letters were actually authored by any lawyer. These letters made up, out of the whole cloth were riddled with ridiculous and easily disprovable lies and outright fiction that almost certainly were the brainchild of Theodore.

83.    In a letter dated October 23, 2012, a true and correct copy of which is attached as Exhibit "A" hereto and made a part hereof.  Gitlin stated that "I am special counsel for Gerson and Gertrude in connection with the Kamen litigation and related cases."  He then admitted that "I was initially brought into the equation

**FIRST AMENDED COMPLAINT**

through Ted [Theodore] as a means by which to assist in coordinating a transition from the Buchalter Nemer law firm ("BN") to replacement counsel due to the less than stellar BN representation and the difficulties facing your parents, in particular Gerson, in light of BN's ineffective services."

84.     The Gitlin letter of October 23, 2012 goes further in making it clear that Theodore was directly involved in guiding the legal activity of Gitlin, wherein his letter states "[a]s part of my assisting in the transition, it became clear that your parents, and again Gerson in particular, required someone to oversee and in effect *quarterback* the enormity and volume of litigation as most clearly attorney Richard Ormond at the BN firm failed miserably in such task.  As time proceeded, I became a bit more involved than anticipated and continue to assist Gerson and Gertrude and Gertrude through and in particular Ted, on the various pieces of litigation both in the bankruptcy arena as well as the civil litigation forum."

85.     This letter supports the claim that Gerson and Gertrude were vulnerable wherein it states that "Gerson, in particular, required someone to oversee and in effect quarterback the enormity and volume of litigation…"

86.     This direction by Theodore of Gitlin breaks the attorney client privilege as between Theodore and Gitlin since Gitlin's ostensible clients were Gerson and Gertrude.

87.     The Gitlin letter is an admission that Theodore selected new counsel for his parents after they had been represented for many years by their own counsel,

the Buchalter Nemer law firm.  This selection of new counsel leads to a presumption of undue influence on the part of Theodore against his vulnerable parents who at that time were not only elderly and infirm but also suffering from financial stress.  What follows was an orchestrated plan by Theodore to use his imagination to create a totally fictional and slanderous picture of his sister, using Gitlin to accomplish his overall plan to take Janice out of the Fox estate.

88.     Theodore knew that his parents loved Janice and were proud of her and her family, and therefore, he needed to paint a totally false and slanderous picture of Janice.  Having wrested control of Gerson and Gertrude's lawyers, Buchalter Nemer and replace them with his handpicked and controllable new lawyer, Gitlin, Theodore was able to have Gitlin write whatever Theodore wanted to accomplish his overall goal of having his parents remove Janice, once and for all, from their estate plan.  Out of the whole cloth, Theodore either crafted by himself or dictated to Gitlin his smear campaign against Janice.

89.     Theodore used Gitlin to support his scheme to isolate Janice from her parents.  Theodore crafted out of whole cloth a series of shameful lies about his sister and conveyed these lies to his vulnerable parents.  Theodore falsely claimed that Janice was a drug user and alcoholic.  He also falsely claimed that Janice physically beat her own children.  These were outrageous and malicious lies concocted by Theodore to further his disgusting scheme of attempting to isolate his parents from Janice.

90.     These outright lies are provably false.  There is not a single person who would confirm any of the nonsense perpetrated by Theodore, whose depravity knows no bounds.  There are countless family members and close friends who can unequivocally blow this up in Theodore's face.

91.     The slander campaign could only have worked because Gerson and Gertrude were elderly and infirm and even though they had a lot of assets they were under short term financial stress and dependent on Theodore, who they were falsely led to believe was the only one who could help them.  But more than that Gerson and Gertrude were totally dependent on Theodore because he had already begun to take over all their assets.

92.     Theodore's motivation was several fold.  He was jealous of his sister because she has a nice family, lots of close friends, and respect in the community. Theodore, on the other hand, is a loner with almost no friends and no standing in the community.

93.     Theodore also had failed in different business ventures.

94.     Theodore saw an opportunity for a successful venture, and that was to take control of his parents' multi-million dollar estate.  As an added bonus he thought at the same time he could try to destroy the relationship Janice had enjoyed with her parents for her entire life.

95.     Before excerpts of letters from Gitlin are set out in these allegations the timeline is important.  The first letter which sets the stage for demanding

28
**FIRST AMENDED COMPLAINT**

complete separation of Janice from her parents is dated November 9, 2012.  In the middle of September 2012, just two months earlier, Gertrude and Janice's older brother Barry were at Janice's house for Rosh Hashanah dinner.  They both slept at Janice's house for two nights with affection and harmony.

96.    Here is what Gitlin wrote to Janice on November 9, 2012, which on information and belief was without any contact or direction from Gerson or Gertrude:

"You (and this includes Philip) are hereby placed on notice that you are to have no further contact, directly or indirectly, with Gerson or Gertrude. That means that you are not to contact your parents by telephone, cell phone, email, letter, nor are you invited to visit their home until you receive further instruction from me or one of their other authorized legal representatives."

A true and correct copy of the November 9, 2012 letter is attached hereto as Exhibit "B" and made a part hereof.

97.    In a third letter from Gitlin, dated November 21, 2012, a true and correct copy of which is attached hereto as Exhibit "C", Gitlin makes further threats to accomplish the goal of isolation.  On information and belief this letter was also directed by Theodore.  The November 21, 2012 letter states in pertinent part:

"I have been provided a copy of your two-page November 15, 2012 letter delivered to Gerson on Friday, November 16, 2012 (delivered by your

29
**FIRST AMENDED COMPLAINT**

son Alex).  I have also been made aware that you have approached and spoken with Gerson on Monday, November 19, 2012.  You have perpetrated both communications with acknowledgement of my October 23, 2012 and November 9, 2012 letters counter-signed by Gerson and Gertrude.

Notwithstanding the clarity, instruction, and specifics of both of my letters to you, you have sought to disregard the content and import of the letters and have instead deliberately communicated with Gerson (interestingly you have effected both avenues when your mother was not present) as part of your November 15, 2012 communication permeate misrepresentations, further acts of disloyalty, and otherwise questioning the veracity and authority of my communication and representation.

As apparently you require something a bit more assertive and poignant in the form of a Court Order, be advised that I have been instructed to proceed in the obtaining of a restraining order against you and Philip (and if need be your children if they intend to continue to serve as messengers and agents for your communications) and will take such actions as necessary to reaffirm, maintain integrity, and enforce the sanctity of my Clients' demand and that they be left alone and not contacted by you.

As everyone has acknowledged, *the jig is up* relative to your true ambitions and intentions.  Your parents want nothing to do with it and would

much prefer for you to simply honor their wishes and at this juncture

demands, without incident, complication, or interference.

Your parents have asked that I provide one last opportunity for you to

listen, understand and comply with their instructions and not to contact

them… They cannot be any clearer. At this point in time you need only to

forward to me your communication via email (that would be fine)

confirming the acknowledgment of Gerson and Gertrude's instructions and

that you agree that you will not contact them until you have been advised

further-in writing and countersigned by their legal counsel-that some form of

communication and relationship may be permitted to resume.

You are provided until end of Monday, November 26, 2012 to advise

me in writing of your acknowledgment, understanding and compliance.

Failure to do so will result in our proceeding with obtaining the requisite

restraining order and taking such further legal action as may be necessary."

And in yet another letter dated November 28, 2012, Gitlin states:

"I will again restate position of my clients… They wish to be left

alone and they wish to not have any future communications or contact from

Janice, Philip, or as indicated in my November 21 letter, their grandchildren

(Janice's children-at least to the extent of those whom she continues to have

communication as I understand that there is even estrangement within the

internal workings of her own family-to the extent that such individuals are

being served as the proverbial pawns and are messengers or agents on behalf of Janice (or Philip)).

Gerson and Gertrude have every right and privilege to have no communication with any of their children and in this instance is focused on their daughter Janice and her lawyer husband Philip."

The overtop posturing by Gitlin, at the direction of Theodore, comes into clear focus as predicate facts for Theodore's real intentions, which not surprisingly were actually reduced to writing. In Gitlin's letter of September 18, 2015 Gitlin says the following, which is quite remarkable because it unabashedly states Theodore's game plan:

"… at Gerson and Gertrude's request per this letter, they ask that you provide for the benefit of Ted [Theodor] as well as Gerson and Gertrude's legal team a full and general waiver and release of any and all claims you have or may have in connection with your parents' estate, assets, Kamen litigation, and disposition of your parents' assets."

98.    One example of the totally false and defamatory statements Theodore directed Gitlin to write in his letters is that Janice had been "conducting herself through the display of childlike tantrums, exhibiting irrational fits of rage and incoherence by reason of a history of apparent/obvious substance abuse." This is unequivocally false and defamatory.

99.    Theodore wanted to make certain that his parents were not violating his directive that they were not to allow anyone into their house, particularly Janice, Kele, Alexander and Adam so Theodore installed a comprehensive surveillance system with a live video feed to anywhere in the world that Theodore might be.  In this way he could monitor his parents to see if they were adhering to his demands that their daughter and grandchildren not be allowed into the house.  To further isolate his bedridden parents, Theodore, with Barry's complicity placed additional locks on the outer gates of the house.

100.    On information and belief if Gertrude and Gerson violated Theodore's demands and allowed Janice and her children into the house he would reprimand and intimidate them.  Theodore was a bully to his parents and kept them in constant fear.  The fear was compounded by the fact that this time Theodore had virtually all of their assets and income and his parents were elderly, physically and mentally impaired, and completely dependent on their bully son.

101.    Theodore also monitored Gerson and Gertrude's telephone calls.  He instructed them that it was not permissible for them to be in contact with Janice and their grandchildren.  Again, if they violated these commands, Theodore would reprimand and intimidate them, and on information and belief withhold money from them.  Over the last three years, Theodore took the mobile phones away from Gertrude and Gerson.  On numerous occasions, Theodore answered calls made directly to Gerson and/or Gertrude instructing the caller that they are not available

33
**FIRST AMENDED COMPLAINT**

to speak or on other occasions Theodore, in his presence would allow his parents to

speak for less than a minute as if they were prisoners in a prisoner system with

rules and regulations that must be adhered to or they would be punished.

102.   The matter escalated for Theodore when he learned in or about

November of 2018 that his uncle and aunt, Rabbi Samuel Fox and Miriam Fox

announced that they were flying in for the wedding of their nephew, Alexander

(son of Janice) and Sarah.  Rabbi Fox is the brother of Gertrude.  They were very

close and spoke almost daily.  Since they dared to come to their nephew's wedding,

Theodore and Barry both put their aunt and uncle on the list of people that could

no longer have any contact with Gerson and Gertrude.  This was a further

escalation of Theodore's terror campaign of isolation.

103.   Likewise, when Barry learned that Rabbi Samuel Fox and Miriam Fox

had decided to attend Alex's wedding, he cut off ties with both of them and their

children.  Both Theodore and Barry worked together to deliberately and

maliciously attempt to cut off Janice and her children from the rest of the family.

This was done so that Theodore and Barry could maintain complete isolation and

control of their parents from Janice so that there could be no opportunity for

reconciliation and a change of heart when it came to taking for themselves the

entire multi-million dollar estate.

104.   This complete isolation and intimidation added to the extreme pain

and suffering of Gertrude and Gerson.

**FIRST AMENDED COMPLAINT**

105.    On December 25, 2020 Gertrude passed away from Covid, after Theodore had placed both of his parents in a nursing facility.  Neither had Covid when they entered the facility, but both contracted Covid while patients of the facility.

106.    Theodore concealed from Janice, Kele, Alexander and Adam the fact of their mother/grandmother's hospitalization.  Theodore further concealed Gertrude's death, the same day she was hospitalized.

107.    Through their own investigation, Janice, Kele, Alexander and Adam learned of the death and made inquiries of funeral arrangements.  They knew that Gertrude had a plot for burial at Home of Peace in East Los Angeles.

108.    Janice and others contacted Home of Peace to inquire about whether funeral arrangements had been made, but they were instructed that Theodore forbade disclosure of the funeral arrangements.  Ultimately, through further investigation, which included contacting the Chaplain of Cedars Sinai Hospital, the Jewish organizations that handle burial in accordance to Jewish law it was discovered that the funeral would most likely occur on Sunday, December 27, 2020.  The time of burial was still unknown.  The director of Home of Peace was then contacted by family members, community rabbis and friends to inquire as to the date and time of the funeral.  Ultimately, Home of Peace informed them that the burial would be at 2:00 pm on Sunday, December 27, 2020, or sooner.

109.    Janice and her family members arrived to Home of Peace early on Sunday morning at around 11:00 am just in case Theodore was up to his usual deception even with regard to the sacred duty under Jewish law of participating in the burial of a mother/grandmother. Sure enough, at approximately 12:40 pm a Rabbi showed up for the burial.  The Rabbi informed Janice and other family members that he had serious doubts that the funeral would take place because Theodore was very upset that family members had learned of the funeral arrangements.  The Rabbi told the family that Theodore would not go forward with the burial unless the family left.  The Rabbi told some of those assembled that Theodore was prepared and threatened to have the body of his mother taken back to the morgue and buried at a different time of his choosing without disclosure to the rest of the family.

110.    Ultimately, after a lot of back and forth, a compromise was agreed to whereby Janice and all of Janice's family and her many friends that came to pay their respects agreed to leave and be out of sight while Theodore had his own private burial.  Theodore's only two guests were his lawyers.  The agreement was that after Theodore completed his burial service, which included lowering his mother's body into the grave and shoveling dirt on the casket, that Janice and her family could conduct their own service.  Unfortunately, Theodore's threats and bullying paid off for him even in the solemn occasion of his mother's death.

111.   As recently as while this lawsuit was being prepared Janice, through her counsel received a letter dated January 19, 2021 from a lawyer from the rehab center where Gerson is a resident advising Janice that "Mr. Fox's [Gerson] legal decision maker [Theodore] has requested a restriction on who can obtain his confidential information and who can act with him." Literally, the isolation continues to occur to this day, and has actually escalated in recent months.

112.   Janice, was unaware until after the death of her mother on December 25, 2020 that the entire isolation plan was devised and implemented so that Theodore and Barry could take, secrete and own for themselves the entire multi-million dollar estate while their parents were still alive.

113.   Theodore and Barry, by their alleged acts, including without limitation, the isolation of both Gerson and Gertrude by controlling and negating their ability to speak to their daughter, Janice; their grandchildren, Kele, Alexander and Adam; Gertrude's brother, Rabbi Samuel Fox and sister-in-law Miriam Fox and other family members whether in person or by telephone, have greatly injured Janice both physically and emotionally by an amount in excess of $1,000,000.00, exclusive of costs and interest to be determined at trial.

114.   Pursuant to *Probate Code* § 259 both Theodore and Barry should be considered by operation of law to have predeceased Gertrude and Gerson and therefore should not (1) receive any property, damages, or costs that are awarded to Gertrude's estate in this action, whether their entitlement is under a will, a trust, or

37

**FIRST AMENDED COMPLAINT**

the laws of intestacy; or (2) serve as a fiduciary as defined in Section 39, if the

instrument nominating or appointing Theodore or Barry was executed during the

period when Gertrude was substantially unable to manage her financial resources

to resist fraud or undue influence.

115.   The acts by Theodore and Barry of physical neglect and isolation as

described above were done with recklessness, oppression, fraud or malice entitling

Janice to punitive or exemplary damages to punish and set an example of Theodore

and Barry.

116.   Janice is entitled to an award of reasonable attorney's fees pursuant to

*Welfare and Institutions Code* § 15657.

## SECOND CAUSE OF ACTION

### (FINANCIAL ELDER ABUSE)

### [Janice v. Theodore and Barry]

### *Welfare and Institutions Code* §§ 15610.30 and 15657.5

117.   Janice incorporates by reference paragraphs 1 through 116 and

realleges same as if fully set forth herein.

118.   At all times relevant herein Gerson and Gertrude were elders as that

term is defined in *Welfare and Institutions Code* § 15610.27 as they were in their

80s and then in their 90s while Theodore and Barry continuously, deliberately and

maliciously isolated them from their daughter, grandchildren, brother and other

extended family members and friends.

119.    As "elders" within the class protected by *Welfare and Institutions Code* § 15600 et seq., Gerson and Gertrude are entitled to heightened and special statutory protections against financial abuse.

120.    Notwithstanding their knowledge that Gerson and Gertrude were elders, Theodore and Barry actually took advantage of their elderly status, poor health, and financial stress to commit financial elder abuse by using manipulation, undue influence, breach of fiduciary duty, fraud, misrepresentations, intimidation, coercion and trickery as more fully set out in the next two paragraphs.

121.    Gerson and Gertrude were also in their 80s and 90s when Theodore and Barry set up a complex set of limited liability companies, wholly owned and controlled by Theodore to act as shields from their individual conduct as they used these companies to take, secrete, appropriate, obtain and retain to this day virtually all of the assets of their elderly and vulnerable parents.

122.    In furtherance of their continuous acts of financial elder abuse, Theodore has himself installed as trustee of Bearbiz and Special Trustee of the Fox Family Trust where he was able to completely control all of the assets once owned by Gertrude and Gerson.

123.    At all relevant times when Theodore was both a trustee and beneficiary of the Fox trusts he completely and deliberately ignored and disregarded his fiduciary duties to the trustors, his parents and to the beneficiaries, including Janice, by among other things, not making disclosure regarding the

**FIRST AMENDED COMPLAINT**

assets, liabilities and income of the trust properties, not rendering an accounting, concealing from the beneficiaries Theodore's incredibly inflated compensation package as special trustee of the Fox Family Trust, which was actually a subterfuge for an attempt to wipe out all equity of the Fox estate. Theodore further did not disclose his conflict of interest in being trustee of the Fox Family Trust and Bearbiz, while at the same time he acquired and attempted to levy on millions of dollars to claims against the assets of both trusts and as against Gerson and Gertrude, individually.

124.   Integral to Theodore and Barry's plan of financial abuse was keeping all of their acts in secrecy so that Janice would be unable to discover their intentional scheme to raid and take for themselves the assets and income of Gertrude and Gerson.

125.   Their designed plan of secrecy worked, at least until the aftermath of the funeral of Gertrude where Theodore's extreme conduct to deny his sister and the grandchildren the solemn participation in the passing of a loved one prompted a full scale investigation into the potential financial improprieties of Theodore and Barry.

126.   In or about January 2021 it was discovered that Theodore used the Fox Family Trust and Bearbiz as mere instrumentalities for his carefully designed and orchestrated plan to take for himself the bulk of Gertrude and Gerson's

**FIRST AMENDED COMPLAINT**

personal assets and income and to obtain Barry's agreement to keep all of this secret from Janice and the grandchildren he left some minimal assets for Barry.

127.   It was also discovered that Theodore went even further with his malicious scheme to take control and ownership of all of his parents' assets when he used his company, Ultimate Action to acquire all of those assets by using a strawman buyer to purchase judgments, charging liens and other claims against his parents from third party creditors.

128.   Theodore then utilized step two of his plan of financial abuse when he commenced actions to foreclose on assets of his parents using judgments, charging liens and other claims to take substantially all of their assets for himself.

129.   To this day, Janice is in the dark as to where the money came from and used by Theodore, through his company Ultimate Action to purchase approximately $20 Million in creditors' claims against Gerson and Gertrude.

130.   On information and belief, it is most probable that Theodore used some type of fraud or trickery to use assets or money of his parents to purchase the $20 Million of creditor claims against them.

131.   The money that was used by Theodore to purchase the creditors' claims remains a mystery because Theodore has used multiple strawmen so as not to have this scheme uncovered.

132.    This entire scheme and acts of financial abuse was orchestrated and concealed by Theodore, all in breach of fiduciary duties to make full disclosure and act with the utmost honesty and integrity.

133.    The conduct of Theodore was done with the utmost dishonesty and lack of integrity and so far he has gotten away with his bullying, intimidation, financial abuse and breach of his fiduciary duties.

134.    Janice is informed and believes that Ultimate Action was used by Theodore, in breach of his fiduciary duties to both the Fox Family Trust and Bearbiz and all of the beneficiaries of both trusts to buy substantial creditor judgments, charging liens and other liens recorded and/or claimed against his father Gerson and mother Gertrude in a four step process.

135.    First, Theodore used an intermediary to purchase the judgments, charging orders and liens that were asserted against Gerson and Gertrude.  Second, Theodore purchased those judgments, charging orders and liens from the intermediary totaling in value in excess of $20 million, for a fraction of their face value.  Third, Theodore, through his wholly owned company, Ultimate Action, asserted these same claims, liens, charging orders and assignments of judgments against his parents, Gerson and Gertrude at full value.  Fourth, Theodore obtained writs of executions, orders for appearance of judgment debtor against Gerson and Gertrude and an application for sale of dwelling against Gertrude and/or against her trust.  All the while Theodore was in a fiduciary relationship with Gerson and

42
**FIRST AMENDED COMPLAINT**

Gertrude as he was a trustee and special trustee of the Fox Family Trust and the Bearbiz Irrevocable Trust as well as being the major beneficiary of those two trusts.

136.   The transactions by which Ultimate Action purchased the creditor claims, first through an intermediary and then a purchase by Ultimate Action from the intermediary was concealed by Theodore from the time he conceived this ideal all the way to the present. It is still unknown the source of the money used by Ultimate Action to purchase several million dollars of assets.

137.   On information and belief, the money most likely came, through some circuitous route from properties or assets once owned by Gerson or one of his many limited liability companies and then routed to one of Theodore's companies.

138.   Janice is informed and believes and based thereon alleges that on or about July 17, 2006 Gerson and Gertrude created a Special Trustee Agreement. This Special Trustee Agreement was created through undue influence and coercion by Theodore for the compensation of Theodore at levels that are far beyond anything that would ever be considered reasonable so as to deliberately strip the Fox estate from Janice and partly from Barry, and to accelerate and advance the entire corpus of the estate directly to Theodore prior to the death of the settlors.

139.   The Special Trustee Agreement recites that the effective date of the agreement is as of August 1, 2011 and shall continue in force for a period of 10 years and therefore by its terms is still in force and effect.  Thereafter, it recites that the agreement shall be renewed automatically for successive terms of three years

unless either party gives written notice to the other party at least 90 days prior to
the expiration of any term of such party's intention to renew.

140.   The compensation structure to Theodore from the Special Trustee
Agreement began at $75,000 per month as of August 11, 2011 and provides that
Theodore's compensation will increase every year by an additional $10,000 per
month.  Based on the formula the monthly compensation is currently $165,000 per
month or $1,980,000 per year.  The compensation continues to either get paid or
accrues for the entire 10 years plus renewals regardless of whether there is any
work activity required by the trust.

141.   The Special Trustee Agreement further provides that "payments shall
be made only to the extent that there is reasonably available cash from the Fox
Properties' operations as a whole… If cash is not available, such unpaid salary will
accrue (without interest) until the Trust is able to make such payments to Special
Trustee.  Both the Trustees and that Special Trustee are mindful of the possibility
that all or part of the compensation of the Special Trustee may not be paid, in
whole or part, to the Special Trustee due to the problems with the Fox Properties.
The Special Trustee has agreed to accept that risk but the Trustees wanted to be
clear the compensation to be paid to the Special Trustee is to be paid before any
distributions are made to their heirs." The agreement further provides that the
Special Trustee shall be paid as additional compensation $500,000 for past services
provided.

**FIRST AMENDED COMPLAINT**

142.    The compensation to Theodore was a device created and structured by Theodore such that the accumulated compensation over the last 10 years would be used to diminish or in fact eliminate all assets of the Gerson and Gertrude estate so as to effectively wipe out any interest that Janice may have inherited as an heir to the Fox estate. The cumulative total either paid or accumulated for the benefit of Theodore over the last 10 years now stands at approximately $11,780,000.00.  This compensation package was the product of undue influence and coercion and is just one part of the massive financial abuse perpetrated by Theodore against his elderly and ill parents as part of his elder abuse.

143.    Theodore and Barry owed Janice a fiduciary duty of honesty, full disclosure, good faith and fair dealing.  Theodore and Barry committed financial elder abuse when they knowingly and willfully breached that duty in order to take for themselves nearly the entire estate of their parents, while they were still alive and to also make certain that Janice would be taken out of the estate as a beneficiary.

144.    In further breach of fiduciary duties owed by Theodore and Barry to Janice all of these underhanded and circuitous financial transactions were done in concealment and malice.

145.    Further, Theodore and Barry took the estate assets through their outright financial abuse, fraud and/or breach of fiduciary duty without having to wait for a triggering event of death of their parents and also to assure that by the

time of their death that even if Gerson and Gertrude wanted to revise their estate plan to include bequests to Janice, Kele, Alexander and Adam that there would be no assets left in the estate.

146.   Theodore's conduct, in which, on information and belief, Barry participated, constituted financial elder abuse in accordance with *Welfare and Institutions Code* § 15610.30(a).

147.   Theodore and Barry's predatory practices unlawfully misappropriated Janice's property, constituted financial abuse and caused Gertrude and Gerson to suffer special and general damages, including substantial emotional distress and frustration pursuant to *Civil Code* § 3345.

148.   As an elder, the above-described facts also entitle Janice to recover treble damages.

149.   As a direct and proximate result of Theodore and Barry's conduct, Janice has incurred and will continue to incur attorneys' fees and related expenses in an amount to be proven at trial.  Janice therefore seeks all of those fees and costs pursuant to *Welfare and Institutions Code* § 15657.5.

150.   Theodore and Barry planned and engaged in their pattern of financial elder abuse with malice, oppression and fraud as those terms are defined by *Civil Code* § 3294, entitling Janice to an award of punitive damages.

/ / /

/ / /

**FIRST AMENDED COMPLAINT**

## THIRD CAUSE OF ACTION

### (BREACH OF FIDUCIARY DUTY)

### [Janice against Theodore]

151.    Janice incorporates by reference paragraphs 1 through 150 and realleges same as if fully set forth herein.

152.    At all times relevant herein, Theodore was Special Trustee of the Fox Family Trust as well as trustee of Bearbiz.

153.    At all times relevant herein, it is alleged on information and belief that Janice, Kele, Alexander and Adam were beneficiaries of the Fox Family Trust and Bearbiz

154.    The Special Trust Agreement of the Fox Family Trust provides that the "Trust has a substantial portfolio of real estate and other investments, including, but not limited to, real properties and real property only entities collectively referred to as the "Fox Properties."

155.    Section "C" of the Trust recites that "Ted's [Theodore] compliance with their [trustees] wishes may potentially place him in a difficult position with respect to their other children and, accordingly, they wish to address those and other issues in this Agreement and their Trust."

156.    The Trust gives Theodore broad powers including leasing activities, rent collection, payment of expenses, hiring, directing and controlling agents, attorneys, accountants, employees or assistants as reasonably appropriate,

commencing, directing, settling and resolving litigation, maintaining accurate books and records, ensuring that proper federal, state and local tax returns, interaction with lenders and investors, and to locate and recover properties that have been lost by the trustee.

157.   The compensation package provided for in the Special Trustee Agreement generally provided for escalating monthly compensation which today stands at $165,000 per month or nearly $2 Million per year.  In addition the Special Trustee Agreement provides for additional compensation of 40% of profits of the Fox real estate portfolio.

158.   In addition to the monthly fees compensation was provided by the trust to Theodore to cover health care costs, including dental and vision coverage and a gym membership at Equinox, Sports Club, etc. gas and vehicle maintenance, meals, travel (including business class travel)

159.   Further, the compensation package provides that if there is not sufficient money to pay this enormous compensation then Theodore will be paid before any distributions are made to the other heirs.

160.   The Special Trustee Agreement further provides that the "Trustees shall have the option to pay any additional compensation due to Special Trustee [Theodore] by transferring to Special Trustee a fractional or whole interest in any real property owning entity within the Fox Properties; provided however, that of such interest shall be subject to the reasonable approval of the Special Trustee…"

161.   Approximately two months after the Special Trustee Agreement became effective on November 28, 2011, an eighth amendment to the Fox Family Trust was executed whereby Theodore was given unilateral power to withdraw/borrow money from the Fox Family Trust for any trust purpose.

162.   As Special Trustee, Theodore was a fiduciary with regard to the other beneficiaries, including Janice.  As a fiduciary, Theodore had a legal obligation to make full disclosure regarding the assets he was managing on behalf of all of the beneficiaries.  To this date, Theodore has failed to render any type of accounting or any kind since he became Special Trustee. Janice has not received a single statement or accounting from Theodore at any time.

163.   Janice made inquiry of Theodore to render an accounting and status of the Fox Properties, but Theodore refused to provide any accounting.  Instead, on information and belief, Theodore used this request as a vehicle to use undue influence against Gerson and Gertrude, causing them to remove Janice as a beneficiary from their estate plan.

164.   Affixed to the Special Trustee Agreement was a list of properties held in the Trust, and this list of properties was initialed by Gerson, Gertrude and Theodore.  To this date, Theodore has not furnished any information regarding the status of any of the properties for which he was appointed Special Trustee regarding income and expenses, whether the loans are current, whether any of the

properties are in foreclosure, whether any of the properties have been refinanced, whether any of the properties have been sold.

165.   Further, Theodore has made no disclosure concerning whether he has been paid compensation pursuant to the agreement or for that matter whether the agreement is still in force and effect and whether he is still managing the portfolio, if any.  Theodore has also not made disclosure as to whether he has been paid the compensation recited in the agreement or whether that compensation was deferred or whether he has received a percentage of profits or whether he has received an interest in any of the properties of the Fox estate.

166.   Theodore knew that as Special Trustee that he was in a fiduciary relationship with the beneficiaries of the Fox Family Trust. Theodore, was also concerned that he had violated fiduciary duties as Special Trustee. As a result of those concerns on August 28, 2011, Theodore sent an email to Gerson's counsel preparing the power of attorney forms and the Special Trustee Agreement stating: "In conclusion… let's make sure I'm protected as a fiduciary anticipating a claim on my performance."

167.   Janice is informed and believes that beginning in June 7, 2012 Ultimate Action began acquiring judgments against Gerson despite Theodore owing fiduciary duties to Gerson, Gertrude, Janice, Kele, Alexander and Adam pursuant to the Special Trustee Agreement and the power of attorney.

**FIRST AMENDED COMPLAINT**

168.    On June 25, 2012, Ultimate Action and Gerson entered into a stipulated judgment in Covina Palms action, the amount $18.5 million – over $7 million more the prospective judgment in that action.

169.    In total, Ultimate Action asserted secured claims against Gerson of $17,473,000.00. These claims were asserted, notwithstanding the fiduciary relationship, and it further impaired and effectively wiped out the interest of Janice, Kele, Alexander and Adam in the Fox Family Trust.

170.    In further breach of his fiduciary duties, Janice is informed and believes that Theodore, acting through his entities Ultimate Action and TF Properties #2, acquired Gerson's interest in twenty-two of the entities itemized on the asset list attached to the Special Trustee Agreement.

171.    Janice is currently unaware of the total amount of money and number of properties that has been obtained by Theodore by and through enforcement and collection actions while acting under his entities Ultimate Action, TF Properties #2 and #3 and/or Supreme Studios.

172.    Janice is informed and believes and based thereon alleges that Theodore's acquisition of judgments and assertion of liens against Gerson, were in violation of the fiduciary duties Theodore owed to the beneficiaries, thus giving rise to damages for breach of fiduciary duty in an amount to be determined at trial.

173.    Theodore acted with malice, oppression and fraud as those terms are defined by *Civil Code* § 3294, entitling Janice to an award of punitive damages.

## **FOURTH CAUSE OF ACTION**

### **(CONSTRUCTIVE TRUST)**

**[Janice Against Theodore]**

174.    Janice hereby incorporates by reference paragraphs 1 through 173 and realleges these paragraphs as though set forth in full.

175.    Janice is informed and believes and thereon alleges that Theodore misused his position as trustee of the Fox Family Trust and Bearbiz by acquiring assets and cash that belonged to the two trusts, without giving the beneficiaries of the trusts any accounting.

176.    Janice contends that any property real or personal acquired by Theodore in breach of his fiduciary duties under the two trusts have imposed upon said property a constructive trust in favor of Janice.

## **FIFTH CAUSE OF ACTION**

### **(UNJUST ENRICHMENT)**

**[Janice Against Theodore]**

177.    Janice hereby incorporates by reference paragraphs 1 through 176 and realleges these paragraphs as though set forth in full.

178.    As a direct and proximate result of Theodore's wrongful conduct as alleged herein Theodore has been unjustly enriched and Janice as been damaged in an amount according to proof at time of trial together with prejudgment interest thereon at the maximum rate provided by law.

**FIRST AMENDED COMPLAINT**

## SIXTH CAUSE OF ACTION

### (INVALIDITY OF TRUST AMENDMENT – WILL CONTEST)

### [Janice Against Theodore and Barry]

179.   Janice hereby incorporates by reference paragraphs 1 through 178 and realleges these paragraphs as though set forth in full.

180.   In 2006 Gerson and Gertrude, as settlors created the Fox Family Trust, naming as beneficiaries, their three children, Barry, Janice and Theodore each to receive one-third of the estate with monetary bequests of $100,000 to each of their four grandchildren and smaller monetary bequests to other third parties.

181.   The Fox Family Trust continued to name as beneficiaries Janice, Kele, Alexander, Adam and the others, intact through 2011 and maybe into part of 2012.  The reason that a date cannot be pinpointed is that neither the settlors, nor Theodore as trustee has kept the beneficiaries informed.

182.   After the death of Gertrude on December 25, 2020, Janice through her counsel has made inquiries of Theodore, through his counsel for disclosure of the original trust documents and all amendments and iterations.  Those requests have been denied.

183.   On information and belief, Gerson and Gertrude amended their trust to remove and eliminate any bequests to Janice, Kele, Alexander and Adam from the estate plan.

184.   On information and belief the amendment removing these beneficiaries occurred after August 2011.

185.   The amendment to the Fox Family Trust was the product of undue influence, slander, breach of fiduciary duties by Theodore; the unlawful taking of the majority of the estate by Theodore; the conflicts of interest of Theodore, the coercion, intimidation and bullying by Theodore.  On information and belief, all of these actions by Theodore were done with the direct participation by Barry.

186.   The actions of Theodore as set out throughout this Complaint, including his take over of the estate, his outrageous compensation package as trustee, his wholesale violation of his fiduciary duties of two different trusts, his failure to make any disclosure to the beneficiaries of the trusts, his treatment of trust assets as if they were all his to the exclusion of the beneficiaries, his control and/or direction to lawyers ostensibly representing Gerson, Gertrude and the trusts, his direct involvement in procuring the amendments removing Janice, Kele, Alexander and Adam from the estate, with the direct participation by Barry, led to these heirs being removed as beneficiaries.

187.   The breaches of fiduciary duties and the fact that Theodore was directly involved in procuring and directing the trust lawyers, for his own benefit leads to a presumption of undue influence in making the amendments that removed Janice, Kele, Alexander and Adam as trust beneficiaries.

188.    Janice is informed and believes and on that ground alleges that Theodore has wrongfully taken, secreted, misappropriated and/or retained real property and personal property belonging to Gertrude and Gerson, which Theodore would not have obtained absent his wrongful conduct.

189.    Theodore's wrongful conduct caused Gertrude and Gerson to execute the amendments which purport to distribute Gertrude's estate in a manner that Gertrude would not have provided for absent Theodore's wrongful conduct.  In causing Gertrude to execute the amendments Theodore deprived Gertrude of the valuable right to distribute her estate in equal shares to her two children as she truly intended.  In taking these actions, Theodore deprived Janice of an interest in the real property located at 337 S. Roxbury Dr., Beverly Hills, California 90212 which Gertrude owned in its entirety, and the property at 15300 E Smoky Hill Rd, Aurora, Colorado 80015 which Gertrude owned through Shops at Shenandoah Shopping Center, LLC, a limited liability company, and any other assets, real or personal that she owned at the time of her death.  Janice is entitled to restoration of her one-third interest in the estate of Gertrude, and in the event that she prevails in her elder abuse claims as alleged herein, she is entitled to one hundred percent of the estate, by virtue of the principle that because of the elder abuse, Theodore and Barry are regarded as though they predeceased Gertrude and are disinherited. *Probate Code §259.*

190.    In taking the above wrongful actions, Theodore acted in bad faith.

**FIRST AMENDED COMPLAINT**

## SEVENTH CAUSE OF ACTION

## (INTENTIONAL INTERFERENCE WITH EXPECTATION OF INHERITANCE)

### [Janice Against Theodore and Barry]

191.   Janice hereby incorporates by reference paragraphs 1 through 190 and realleges these paragraphs as though set forth in full.

192.   Janice is the daughter of Gerson.

193.   Janice has enjoyed a close relationship with Gerson over many years.

194.   In 2006, Gerson and Gertrude were settlors of the Fox Family Trust.  On information and belief, that trust provided among other things that Janice was to receive one-third of the trust assets upon the death of the settlors.

195.   Janice has a reasonable expectation to inherit a one-third portion of the estate of Gerson because, on information and belief, the trust documents so provided from 2006 through and including 2011 and she is the only daughter of Gerson.

196.   Theodore knew of the inheritance for Janice and he deliberately devised and carried out a systematic plan of undue influence, slandering of Janice, stealing the trusts, and he intimidated and bullied his parents into eliminating Janice from the estate plan.

197.   On information and belief, Janice alleges that through the deliberate acts of Theodore, including his outright breach of fiduciary duties as to the Fox

**FIRST AMENDED COMPLAINT**

Family Trust and Bearbiz, his raiding of the assets of both trusts, his slander of Janice, and his conduct as described throughout this Complaint, he caused Gerson to change his estate plan and eliminate his bequest to Janice.

198.   As a result of Theodore's interference with expectation of inheritance Janice has been damaged in that but for that interference she would have received one-third of Gerson's estate.

199.   Janice's one-third of her inheritance expectancy was further diminished by Theodore's usurpation of the trust assets by his conduct as described throughout this Complaint.

200.   The acts taken by Theodore were malicious and intentional and meant to harm Janice.  Theodore and Barry also knew that Gerson was a senior, and *Civil Code* § 3345 is triggered, as are punitive damages under *Civil Code* § 3294.

## **EIGHTH CAUSE OF ACTION**

### **(ACCOUNTING)**

### **[Janice Against Theodore]**

201.   Janice hereby incorporates by reference paragraphs 1 through 200 and realleges these paragraphs as though set forth in full.

202.   In breach of his fiduciary duties owed to Janice vis-à-vis the Fox Family Trust and Bearbiz, Theodore took money and assets that should have gone to Janice as a beneficiary of these trusts.

203.    Janice seeks an accounting of all monies that Theodore took or made unavailable to Janice from the trusts.

## NINTH CAUSE OF ACTION

### (INVALIDITY OF SPECIAL TRUSTEE AGREEMENT)

### [Janice Against Theodore]

204.    Janice, incorporates by reference paragraphs 1 through 203 and realleges these paragraphs as though set forth in full.

205.    The Special Trustee Agreement was the product of undue influence, slander, breach of fiduciary duties by Theodore; the unlawful taking of the majority of the estate by Theodore; the conflicts of interest of Theodore and the coercion, intimidation and bullying by Theodore.

206.    The compensation package provided to Theodore was outrageous, unconscionable, unreasonable and was a thinly disguised attempt by Theodore to strip the substantial assets once owned by Gerson and Gertrude from their estate so that Theodore could accelerate his inheritance and wipe out all equity of his parents' estate so that the estate would have no assets or income for Gerson and Gertrude making them dependent on Theodore for their needs, and to further to make certain that there would be no assets left for Janice to inherit.

207.    Further, the Special Trustee Agreement was an integral part of Theodore's scheme to have complete control of Gerson and Gertrude and was used

58
**FIRST AMENDED COMPLAINT**

as leverage by Theodore to coerce his parents into eliminating Janice, Kele,

Alexander and Adam as beneficiaries of their estate.

208.   The creation of the Special Trustee Agreement was the product of

undue influence as Theodore had direct involvement in procuring lawyers to draft

the agreement.  Theodore also directly crafted the terms for his own benefit.

209.   In taking the above wrongful actions, Theodore acted in bad faith.

## TENTH CAUSE OF ACTION

### (INVALIDITY OF BEARBIZ IRREVOCABLE TRUST)

### [Janice Against Theodore]

210.   Janice hereby incorporates by reference paragraphs 1 through 209 and

realleges these paragraphs as though set forth in full.

211.   The creation of Bearbiz is invalid for several reasons.

212.   First, it was the product of undue influence, slander, breach of

fiduciary duties by Theodore; the unlawful taking of the majority of the estate by

Theodore; the conflicts of interest of Theodore and the coercion, intimidation and

bullying by Theodore.

213.   Second, Janice is informed and believes and thereon alleges that

Gerson received no consideration from Bearbiz in exchange for his transfer of the

Membership Interests to Bearbiz estimated to be worth many millions of dollars.

214.   Third, Janice is informed and believes and thereon alleges that

Bearbiz was conceived of and created by Theodore as a device to siphon off the

59
**FIRST AMENDED COMPLAINT**

estate of Gertrude and Gerson to Theodore and a small portion, if any remaining, to Barry.

215.   Fourth, the creation of Bearbiz was a thinly disguised attempt by Theodore to strip the substantial assets once owned by Gerson and Gertrude from their estate so that Theodore could accelerate his inheritance and wipe out all equity of his parents' estate so that the estate would have no assets or income for Gerson and Gertrude making them dependent on Theodore for their needs, and to further to make certain that there would be no assets left for Janice to inherit.

216.   In taking the above wrongful actions, Theodore acted in bad faith.

## ELEVENTH CAUSE OF ACTION

### (ACCOUNTING)

### [Janice Against Theodore]

217.   Janice hereby incorporates by reference paragraphs 1 through 216 and realleges these paragraphs as though set forth in full.

218.   In breach of his fiduciary duties owed to Gertrude, Theodore took money and assets from her.

219.   Janice is entitled to an accounting and seeks an accounting of all monies that Theodore took from Gertrude.

///

///

**FIRST AMENDED COMPLAINT**

## TWELFTH CAUSE OF ACTION

## (ACCOUNTING)

## [Janice Against Theodore, Bearbiz, Ultimate Action, Supreme Studios, TF Properties 2 and TF Properties 3 and Roes 1 through 100]

220.   Janice hereby incorporates by reference paragraphs 1 through 219 and realleges these paragraphs as though set forth in full.

221.   Janice is informed and believes and based thereon alleges that Theodore used his entities, including without limitation Bearbiz, Ultimate Action, Supreme Studios, TF Properties 2 and TF Properties 3 and Roes 1 through 100, in his scheme to take money from his parents in an unconscionable and outrageous way, including by using these entities to buy creditor judgments, charging liens and other liens recorded and/or claimed against Gerson and/or Gertrude, and to conceal his own financial interest in and ownership and control over those entities so that he could complete this financial elder abuse as alleged hereinabove.

222.   Janice is informed and believes and based thereon alleges that Theodore used his entities, including without limitation Bearbiz, Ultimate Action, Supreme Studios, TF Properties 2 and TF Properties 3 and Roes 1 through 100 are and at all relevant times were alter egos of Theodore and mere instrumentalities used by Theodore to accomplish his unsavory purposes.

223.   Janice is entitled to an accounting and seeks an accounting of of all monies received by or paid by Bearbiz, Ultimate Action, Supreme Studios, TF

**FIRST AMENDED COMPLAINT**

Properties 2 and TF Properties 3, including without limitation an accounting

showing the origin and disposition of the funds used by Defendants to buy creditor

judgments, charging liens and other liens recorded and/or claimed against Gerson

and/or Gertrude.

## THIRTEENTH CAUSE OF ACTION

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

### [Janice Against Theodore]

224.   Janice hereby incorporates by reference paragraphs 1 through 223 and

realleges these paragraphs as though set forth in full.


225.   The actions of Theodore in preventing Janice or her children from

being able to visit Gerson or Gertrude or to communicate with them, the

concealment of Gertrude's death from Janice, the prevention of Janice from

attending or participating in the funeral and burial of her mother, Gertrude, the

threat to postpone the burial of Gertrude in violation of Jewish religious law in

order to prevent Janice and her family from attending, and the other outrageous

related actions of Theodore alleged hereinabove constituted extreme and

outrageous conduct with the intention of causing, or with reckless disregard of the

probability of causing, emotional distress to Janice, and as a result of that

outrageous conduct, Janice suffered severe and extreme emotional distress, which

was and is substantial and enduring.  The proximate cause of the severe and extreme emotional distress was the outrageous conduct of Theodore.

226.   The behavior of Theodore was outrageous because he abused a relation or position which gave him power to cause damage to Janice, he knew that Janice was susceptible to injuries through mental distress, because of the circumstances as alleged herein in which Janice had a close and loving relationship with her parents prior to Theodore's malicious interference, and because of the predictable upset that Janice had when learning of her mother's death and the fact that her brother Theodore had concealed it and the location and time of the funeral from her.  Furthermore, Theodore acted intentionally and unreasonably with the recognition that his acts were likely to result in illness through mental distress to Janice.  Moreover, Theodore's conduct was extreme and outrageous because he knew that Janice was peculiarly susceptible to emotional distress at the time, due to the foregoing circumstances, which caused her to have physical and mental conditions and/or peculiarities that made her so susceptible.

227.   Theodore engaged in the foregoing conduct with malice, oppression and fraud as those terms are defined by *Civil Code* § 3294, entitling Janice to an award of punitive damages.

/ / /

/ / /

/ / /

**FIRST AMENDED COMPLAINT**

# **PRAYER**

**WHEREFORE**, Janice prays that judgment be entered as follows:

1. On the First Cause of Action, for general damages for pain and suffering pursuant to *Welfare and Institutions* Code § 15657(b), for damages under *Welfare and Institutions* Code § 15610.43 and an award of reasonable attorneys' fees pursuant to *Welfare and Institutions* Code § 15657(a), and for punitive or exemplary damages to punish and set an example of Theodore and Barry;

2. On the Second Cause of Action, for general damages for pain and suffering pursuant to *Welfare and Institutions* Code § 15657.5(b), for damages under *Welfare and Institutions* Code § 15610.43 and an award of reasonable attorneys' fees pursuant to *Welfare and Institutions* Code § 15657(a), and for punitive or exemplary damages to punish and set an example of Theodore and Barry;

3. On the Third Cause of Action, for damages in an amount to be determined at trial for Defendant Theodore Fox's breaches of fiduciary duty, and for punitive or exemplary damages to punish and set an example of Theodore;

4. On the Fourth Cause of Action, for imposition of a constructive trust in favor of Janice on any property real or personal acquired by Theodore in breach of his fiduciary duties under the two trusts and for a preliminary and permanent injunction prohibiting Defendants, or any of them, from selling,

**FIRST AMENDED COMPLAINT**

conveying, encumbering or transferring any interest in any of the real or personal property acquired by Theodore from Gerson or Gertrude, including but not limited to the real property located at 337 Roxbury Dr. , Beverly Hills, California or the real property located at 15300 E Smoky Hill Rd, Aurora, Colorado 80015.

5. On the Fifth Cause of Action, damages in an amount according to proof at time of trial together with prejudgment interest thereon at the maximum rate provided by law;

6. On the Sixth Cause of Action, for declaratory relief finding the amendments to the Fox Family Trust removing and eliminating any bequests to Janice to be invalid, and for the restoration of Janice's one-third interest in the estate of Gertrude, including but not limited to the real property located at 337 Roxbury Dr., Beverly Hills, California and the real property located at 15300 E Smoky Hill Rd, Aurora, Colorado 80015 and any other real or personal property or assets in Gertrude's estate at the time of her death or thereafter, and, in the event that Defendants are found to be liable for elder abuse and therefore disinherited pursuant to *Probate Code §*259, for one hundred percent of the estate.

7. On the Seventh Cause of Action, for damages in the amount to be determined at trial and for punitive or exemplary damages to punish and set an example of Theodore and Barry;

65
**FIRST AMENDED COMPLAINT**

8. On the Eighth Cause of Action, an accounting of all monies that Theodore took or made unavailable to Janice from the trusts;

9. On the Ninth Cause of Action, for declaratory relief finding the Special Trustee Agreement to be invalid;

10. On the Tenth Cause of Action, for declaratory relief finding Bearbiz to be an invalid trust;

11. On the Eleventh Cause of Action, an accounting of all monies that Theodore took from Gertrude.

12. On the Twelfth Cause of Action, an accounting of all monies received by or paid by Bearbiz, Ultimate Action, Supreme Studios, TF Properties 2 and TF Properties 3, including without limitation an accounting showing the origin and disposition of the funds used by Defendants to buy creditor judgments, charging liens and other liens recorded and/or claimed against Gerson and/or Gertrude.

13. On the Thirrteenth Cause of Action, for damages in an amount to be determined at trial for Defendant Theodore Fox's intentional infliction of emotional distress, and for punitive or exemplary damages to punish and set an example of Theodore

On all Causes of Action, for such other and further relief as the Court may deem just and proper under the circumstances of this case.

/ / /

**FIRST AMENDED COMPLAINT**

Dated: August 27, 2021          LAW OFFICES OF PHILIP KAUFLER


By:   /s/ Philip Kaufler
          Philip Kaufler, Esq.
          Attorneys for Plaintiff JANICE FOX

Dated: August 27, 2021          STRECKER LAW OFFICES


By:   /s/ Marc S. Strecker
          Marc S. Strecker, Esq.
          Attorneys for Plaintiff JANICE FOX

67
**FIRST AMENDED COMPLAINT**

## **DEMAND FOR JURY TRIAL**

Plaintiff JANICE FOX demands trial by jury on all Claims that are subject

to jury trial.

Dated: August 27, 2021                    LAW OFFICES OF PHILIP KAUFLER


By:   /s/ Philip Kaufler
           Philip Kaufler, Esq.
           Attorneys for Plaintiff JANICE FOX

Dated: August 27, 2021                    STRECKER LAW OFFICES


By:     /s/ Marc S. Strecker
           Marc S. Strecker, Esq.
           Attorneys for Plaintiff JANICE FOX

**FIRST AMENDED COMPLAINT**